Sheldon Hat Blocking Co. agt. Eickmeyer Hat Blocking Co.

# SUPREME COURT.

THE SHELDON HAT BLOCKING Co., plaintiff, agt. THE EICK-
MEYER HAT . BLOCKING Co., ARCHIBALD T. FINN and
CHARLES ATWOOD, defendants.

*Corporation — Power of trustees — transfer of property to pay debts — delay
in seeking equitable relief.*

Directors and trustees of a corporation are its agents to advance the pur-
poses and objects of its organization, and they have no authority, in
virtue of their office, to perform acts, which to all intents and purposes,
terminate the corporation by taking away from it the power to accom-
plish the object of its formation. But, while this is true, yet it is the
duty of the trustees of a corporation to pay its debts and to apply the
corporate property to this end, although it should exhaust them, and
thus disable the corporation from carrying on its business.

The plaintiff, a corporation formed for the purpose of blocking and shap-
ing hats, and making and licensing machines for stretching hats, for
which it had letters patent, was prosecuted in the federal courts by the
defendant corporation, for an infringement of its letters patent for
stretching hats; the action resulted in a decree by which it was adjudged
that the plaintiff's process was an infringement of the defendant's pro-
cess, and it was perpetually enjoined from using the same, and it was
adjudged to pay the sum of $97,000 as damages for the infringement,
which plaintiff was unable to pay.

Whereupon the trustees of the plaintiff entered into negotiations with
the trustees of the defendant corporation for a settlement of the dam-
ages, which resulted in an agreement that the plaintiff should transfer
to the defendant corporation its patents for blocking, as well as those
for stretching hats, which latter had been adjudged to be an infringe-
ment, in payment and discharge of the judgment for damages, and
which agreement was consummated by such transfer.

*Held,* in an action brought five years thereafter in the name of the plain-
tiff corporation to set aside such transfer as fraudulent and as *ultra vires,*
that the transfer was valid and should be upheld, it not appearing that
the plaintiff had at the time any other means of paying the judgment;

Sheldon Hat Blocking Co. agt. Eickmeyer Hat Blocking Co.

and no offer being made, even now, to pay the same, and no readiness or ability to do so being alleged in the complaint:

Further, that as to the patent for stretching hats, the offending patent, which could no longer be used by the plaintiff, it was just, under the circumstances, that it should be surrendered and that the process for blocking hats, which could only be profitably used in connection with the stretching process, had no such value as to approximate to the amount of the judgment for damages; and that in making the transfer the trustees of the plaintiff, who directed it, did nothing more than apply its only available means to the payment of an acknowledged indebtedness, and that the value of the property transferred was not in excess of the amount of the claim of defendant.

Also, *held*, that the transfer was not void under the provisions of the Revised Statutes (*part* 1, *chap.* 18, *tit.* 4, *sec.* 4) forbidding the assignment by a corporation of its property in contemplation of insolvency.

The effect of delay in seeking equitable relief in cases of this character considered.

*Special Term, July*, 1878.

*George Ticknor Curtis*, for plaintiff.

*Luther R. Marsh*, for defendant Eickmeyer company.

*Edward T. Bartlett*, for defendant Finn.

VAN VORST, *J.* — The complaint in this action charges, that certain assignments, made on the behalf of the plaintiff, and executed by Finn, the president of the plaintiff to the defendant corporation, of divers letters patent and licenses, on the 5th day of May 1873, were fraudulently made, in pursuance of secret and fraudulent negotiations, between himself and officers of the defendant corporation, and without the knowledge or consent of his co-trustees, and in furtherance of efforts on the part of the defendant corporation to obtain and acquire the patents and property of the plaintiff; that the acts of making and receiving the assignments, were illegal and void, and it is asked, that they be set aside, and the property restored to the plaintiff.

The evidence establishes that the plaintiff was organized as a corporation, under the statutes of New York, for the purpose, among other things, of blocking and shaping fur and wool hats, and that part of its business was making and licensing machines for stretching and blocking hats.

The articles of incorporation were filed September 20, 1868.

The capital stock of the corporation was $300,000, divided into 3,000 shares of $100 each. No cash capital appears to have been paid in, but the stock was issued in payment for letters patent, which were transferred to it.

One of the patents owned by the plaintiff was for stretching the brims and tips of hat bodies, the others were for blocking hats.

The defendant corporation was also engaged in the business of granting licenses for both stretching and blocking hats under its own patents.

In the year 1870 the defendant corporation, commenced an action in the federal court, against the plaintiff, charging it with infringing its patents, for stretching the brims and tips of hats.

This action resulted in a decree made on or about the 31st day of January 1873, by which it was adjudged that the plaintiff's process was an infringement of the defendants' patent for stretching hats, and a perpetual injunction was issued thereupon against the plaintiff and certain persons, its licensees, who were joined as defendants with it.

By the decree, it was referred to a master to ascertain and report the damages sustained by the plaintiff in that action, occasioned by the infringement of its patents, and on or about the 16th day of April, 1873, the master reported damages against the plaintiff, in the action, to the amount of $97,000, and upwards.

About the time of the commencement of the action in the federal court the plaintiff herein was advised by one or more patent experts, that their process was an infringement of the

defendants' patent, and during the pendency of the action, and particularly after the decree ordering the injunction, and while the proceedings were pending before the master, the officers of the plaintiff became apprehensive of the result of the reference, and overtures were made on its behalf to the defendant corporation for some arrangement by which they could use the defendants' process for stretching hats.

Stockholders of plaintiff, engaged in the business of hat making, shared this apprehension, and were anxious that some arrangement might be made with the defendant corporation.

But no settlement or arrangement could be effected, which involved the right on the plaintiff's part, in any way, to use the defendants' process.

About the time the plaintiff's officers were advised of the master's report, the active trustees thereof consulted Charles M. Keller, Esq., their counsel in the action, who, in substance, advised them that the only course open to them, in so far as a legal contest was concerned, was to give security, which would be in double the amount of the sum reported by the master, and appeal from the judgment.

It is quite clear that the plaintiff was unable to furnish this security, even had its officers been disposed to adopt the course suggested by Mr. Keller. The plaintiff had no property, except its patent, and some machinery for blocking and stretching hats, which were in the hands of its licensees, and no moneys except some few thousand dollars due from the licensees.

The magnitude of the sum reported by the master seemed an insurmountable difficulty, and the result of the litigation in the federal court, rendered the prosecution of the plaintiff's business entirely hopeless, unless some arrangement could be yet made with the defendant corporation, by which the right to use its patent might in some way be secured.

Atwood, one of the trustees of the plaintiff, with Finn its president, called upon Mr. Sheather, the representative of the defendant corporation, who had the matter in charge, to learn

what arrangement or settlement might yet be made.   Sheather refused all compromise.   The defendant corporation felt aggrieved at the plaintiff's infringement of its rights.   Sheather insisted upon the payment of the whole amount ; if not paid, he in substance said, that he would sell all the plaintiff's property, and invoke extreme measures.   His manner was earnest.

Atwood then gave the matter up ; to use his own language "gave up the ship."   Sheldon, another trustee, had advised with the defendants' officers before this, but could secure no arrangement.

After the interview with Sheather, Atwood told Finn, the president of the plaintiff, that he must settle the matter the best way he could.

Failing to secure any other terms, the president offered, finally, to convey to the defendant corporation all the plaintiff's letters patent for blocking and stretching hats, and the outstanding licenses, in satisfaction of the defendants' claim for damages, which proposition was accepted.

The substance of this agreement, before it was carried formally into effect, was, by the president, communicated to Sheldon.   The settlement was distasteful to him, but. as he himself has testified, there were no stockholders of means to resist, and one or more of the stockholders informed Sheldon that they would be compelled to submit to such terms.   Pearce, a stockholder and licensee, and a defendant in the action, also, finally so stated.   Transfers were accordingly made to the defendant corporation of the plaintiff's patents and outstanding licenses, and a release was drawn and executed of the defendants' claim, to the damages awarded.

By the terms of the settlement, the defendant corporation was to collect the sums due from licensees, and pay over to the plaintiff, such as had accrued up to the 1st day of April, 1873, which they subsequently did.   The sum paid to the president of the plaintiff, upon these licenses, amounted to about $8,000.

The president paid to Sheldon, at this time, about that

Sheldon Hat Blocking Co. agt. Eickmeyer Hat Blocking Co.

amount, and he shortly thereafter left this country for Europe, where he remained for three years, and then returned, and it is upon a complaint, verified by Sheldon, that this action to set aside the transfers is brought.

The stockholders of the plaintiff at or about the time of the transfers, learned of the fact of their having been made, but have, up to the time of the commencement of this action in the year 1878, taken no steps to impeach them.

Contemporaneous with the transfers of its patents, the corporation ceased to do business, and has not resumed it since.

The first question to be decided, upon this résumé of the evidence is, do the facts sustain the allegations of the complaint, by which it is claimed that the transfers were made in pursuance of a secret arrangement, wholly unauthorized, between Finn, the president, and the officers of the defendant, without the knowledge or approval of his cotrustees, in furtherance of improper aims on the part of the defendant corporation, by the acquisition of its property, to destroy the plaintiff ?

I do not think that the facts justify a conclusion of such fraudulent purpose on the part of Finn and the others.

It is claimed, in the complaint, by way of establishing a fraudulent conspiracy and design, that Finn, the president, procured the advice to be given by Mr. Keller, to the effect that the only remedy open to the plaintiff, in the action in the federal courts, was through an appeal, upon giving bonds. It is claimed that such advice and counsel was erroneous and was part of Finn's scheme to discourage his associates and bring about the transfers.

The evidence wholly fails to show that the advice was given at the instance of Finn.

It was first given to the three trustees together, Finn, Sheldon and Atwood. My judgment is, that all Mr. Keller meant to convey to the trustees was, that the question of infringement was the principal subject. That that was the real question which they must meet, and that to correct any

error in that regard, an appeal would be necessary in the end, and that would involve the giving of security.

With respect to the question of damages, he had been consulted previously, and had written to the plaintiff a letter, which is in evidence, and which announced the principles which must prevail in their consideration by the master, and he suggested the only way in which they might be mitigated.

It is true that any error of the master, in the computation of damages, might, upon exception, be corrected.

But there is nothing before me which shows any error, and the amounts reported must be taken as both proper and legal.

But whether Mr. Keller was right or wrong in the counsel he gave there is nothing to show that it was given or received in furtherance of any fraudulent purpose. The excellent standing of Mr. Keller in his profession, and as a man, forbids any such conclusion, in the entire absence of evidence, to give any support to it.

Nor is it true that the terms of the transfer were secretly arranged between Finn and the officers of the defendant corporation.

Three of the trustees, and some of the stockholders, knew of the demand of the defendant corporation, as a condition of the settlement, and gave in their adhesion, and Sheldon left the country with full knowledge of the fact of the transfers.

The transfers were not made, in my judgment, with any purpose of defrauding the stockholders of the plaintiff. I conclude, from the facts, that the trustees of the plaintiff, who participated in the settlement, had become satisfied that all hope of any adjustment, which was greatly desired, by which the plaintiff could secure a right in any way, to use the defendants' processes for stretching hats, must be given up and abandoned.

The damages were so large as to be beyond their means of payment, and the business of blocking hats, without the stretching process, was of little value.

The trustees, and some of the stockholders at least, had a notion, whether correct or not, that the stockholders and trustees were personally liable for the damages, in the event that the corporation was unable to pay them.

Such were the principal reasons operating upon the persons representing the plaintiff, which led to the surrender of the patents, and licenses, by way of adjusting the difficulty.

In so far as the advice of Mr. Keller was concerned, it had no further influence than as it indicated his opinion, that the damages were computed upon principles which forbade any hope of material reduction, and that resistance for the future must be on the merits, by an appeal from the judgment itself.

It would seem that they had no reasonable ground of hope in that direction.

They had long before been advised by Mr. Renwick, an expert upon such subjects, whom they had consulted, that their stretching process was an infringement upon the defendant corporation, and their own computation of damages, which it appears they made, reached a sum far beyond their ability to liquidate.

I conclude, therefore, that the settlement made with the defendant corporation, was not the offspring of fraud, but was the only method, which seemed open to the plaintiff, to end a litigation and controversy, which, if protracted, must sooner or later end in disaster and loss to the corporation and the stockholders themselves.

But it is urged by the counsel for the plaintiff, that the transfers of the patents were not the act of the trustees, but of Finn, individually, and that they are, for that reason, void, and in addition that the trustees themselves, if consenting, had no power to make the transfers. That the act was *ultra vires*. The fact of actual participation of the *three* trustees, Finn, Atwood and Sheldon, in the negotiations for the settlement, is abundantly shown.

The principal part of the negotiation was clearly intrusted to Finn. But the terms agreed upon were submitted to,

and were adopted by, his associates. Of the stockholders, Dickinson and Pearce advised it, and it cannot but be that other stockholders, residents of the city, knew of the transaction at the time it was being consummated.

They must have known of the judgment of the federal court, and the award of damages; their interest in the corporation would lead to such conclusion. There is no evidence that any stockholder, interposed to prevent the transfer.

Many of the stockholders, doubtless felt, as Atwood expressed himself, and were disposed to give up the whole matter, if a settlement could only be effected upon such conditions. The book of minutes of the plaintiff, kept by its secretary, has been given in evidence; it contains a record of a meeting under the date of April 10, 1873, of a majority of the directors, Finn and Atwood being present. The correctness of the minutes is testified to by the secretary, Mr. Plume, who was a stockholder. At this meeting a resolution was adopted, which, after reciting the pendency of the action in the federal court, and its adverse decision, and *the proceedings to assess damages,* the payment of which the company had not the means, except by a sale of its property, authorized the president to negotiate and conclude a settlement, between the defendant corporation and the plaintiff, of the amount of damages recovered *or to be recovered,* with costs of the suit, and that in order to pay the same, the whole or so much as might be necessary of the property, patent-rights, assets and effects, belonging to the company, be sold and transferred; that the president be and he was authorized to sell, assign, transfer and convey the same, or any of them, or any part thereof, for the best price he could obtain, and to make, execute and acknowledge and deliver all deeds, assignments, transfers, and other instruments in writing necessary, and to affix the seal of the corporation thereto, and sign his name thereto as president.

This resolution, if adopted by the requisite vote of the trustees, would seem to authorize the president to make the

Sheldon Hat Blocking Co. agt. Eickmeyer Hat Blocking Co.

transfers in question, unless the act was one the trustees were not authorized to perform.

It is urged, on behalf of the plaintiff, that the transfers of this property destroyed the corporation, and that the trustees of a corporation have no power to perform any act which would lead to such result.

The first answer to this objection is, that the transfers of this property did not destroy the corporation.

Its existence did not depend upon its title to the patent rights and licenses in question. It might acquire other means and processes for continuing its work.

But I apprehend a large view of the subject would embrace, as chief cause of the failure of the then purposes of the corporation, the fact that it relied for success upon a patent, the processes under which was an invasion and infringement of the rights of others.

This element of destruction to its business was present so soon as it commenced operations, and must at some time culminate in disaster.

I am referred by the learned counsel for the plaintiff to *Abbott* agt. *Hard Rubber Company* (33 *Barb.*, 578) as an authority condemnatory of the act of the trustees in making the transfers. That is a very important case; it places the duties of directors and trustees of corporations upon grounds which must surely command the approval and respect of every court.

It declares that directors of a corporation are its agents to manage its affairs and carry out the purpose and object of its formation, and not to inflict upon it political death. That an act, which to all intents terminates the corporation by taking from it its power to fulfill the purposes of its organization, is not within the powers of its directors. *Smith* agt. *N. Y. C. Stage Co.* (18 *Abb. Pr.*, 419); *Copeland* agt. *Citizens' Gas Company* (61 *Barb.*, 60); *Frothingham* agt. *Barney* (6 *Hun*, 366); *Taylor* agt. *Earle* (8 *id.*, 3); *Gray* agt. *N. Y. and*

*V. S. S. Co.* (3 *Hun*, 383), all announce the same doctrine declared in *Abbott* agt. *Hard Rubber Company*.

But the case under consideration differs " *toto cœlo* " in its essential facts, from those cited.

The corporation had, in substance, a judgment against it for nearly $100,000 which it could not evade, and had no means to discharge except by applying its property. This judgment was the result of its operating one of the principal patents which largely represented its capital stock. It could not pay the debt, and it was perpetually enjoined from using the processes under the patent. The debt must be paid. It is certainly the duty of the trustees to pay the corporate debts and to apply the corporate property and means to this end, although it should exhaust them ; and if that is to destroy the corporation, such result cannot be avoided. A corporation can no more avoid the payment of its debts than an individual can evade his honest obligations. The individual must apply his property to satisfy the just demands of his creditors until they are exhausted, although the result be the destruction of his business and his impoverishment.

Could there have been any other means adopted to liquidate the claim of the defendant corporation than by the transfer of its property ? If there could, they should doubtless have been employed, before resorting to the extreme measure of parting with the patents.

None, even now, has been suggested; the case discloses none.

The justice of the judgment of the federal court must be conceded. It is apparent that the trustees must have acknowledged it.

Under such circumstances, was it more than justice and equity demanded that the offending patent, which could no longer be operated by the plaintiff, should be delivered to the injured party that it might no longer be used to the defendants' damage ?

This patent was in fact now valueless to the plaintiff, and

in itself furnished no valuable or meritorious consideration for the release of the claim of damages. All that the plaintiff had in effect to transfer of value, was the hat blocking patents, and the outstanding licenses; and the latter, in so far as they authorized the use of the stretching machines, it was proper that they should be revoked or surrendered. In my judgment its inability to use the patents for stretching hat bodies was of itself sufficient to vitally impair the work in which the plaintiff was engaged, for the evidence shows that the process of blocking hats, was dependent upon that of stretching. That the practical value of the patents consisted in their being used together.

The plaintiff's patents for blocking hats without doubt contained improvements of value. These consisted of an expansible hat block, a banding ring so arranged as to be capable of a reciprocating motion, up and down, and double jointed levers operating by a centrifugal motion, to press the brim outward in a uniform manner.

But the defendant corporation owned valuable patents for blocking hats. It claims that its patent was the oldest, in fact the "bottom, patent."

The original, or Eickmeyer blocker, embraced the block, plates for clamping the brim, and a banding ring.

The plaintiff's patent, however, contained conceded improvements.

But the defendant corporation urged upon the trial that the plaintiff's improvements were upon apparatus secured to defendant by its patents, and that the plaintiff used, in addition to its own improvements, the apparatus covered by the defendants' patents, and that they had contemplated prosecuting the plaintiff for an infringement of their rights under their patents for blocking, also.

Assuming however, that the plaintiff's improvements were truly useful and new, and that they could not be interfered with, was the transfer of the patents for blocking, under the circumstances void?

It was the only property plaintiff had to give in settlement of the defendants' claim for damages, and, deprived of the use of the patent for stretching, it was practically useless.

It is true that Mr. Sheldon testified that the plaintiff's blocking patents had great value, largely in excess of the claim of the defendant corporation, for damages; but if he truly believed at the time that they had so great value, and that the transfer could be questioned for that reason, why did he not take steps to resist it when the matter was under consideration and about to be accomplished? Why did he not suggest some other available way of settlement, and why did he leave the country directly the transfer was made, and remain abroad for several years, with knowledge of the fact, that the patent had passed to the defendant corporation, in satisfaction of its claim? Why did he acquiesce in the transfer when it was finally decided upon?

But the value now placed by Mr. Sheldon upon these patents, was based upon their receipts in connection with the hat stretching patent, and the two patents could only be practically and profitably used together.

That being so such receipts are no safe guide to determine the value of the improved patents for blocking. The evidence decidedly preponderates in the direction that the value of these patents did not, in any degree, approximate to the amount of damages awarded.

I cannot, therefore, conclude that in the transfer of these patents the trustees of the plaintiff, who directed it, did any thing more than apply its only available means to the payment of an acknowledged indebtedness, and that the value of the property transferred was not in excess of the amount of the defendants' claim.

I do not think that any such value has been established, with respect to these patents, as to call upon a court of equity to invalidate the transfers.

But it is further urged by the learned counsel for the plaintiff, that the transfer was void, under the provisions of the

Revised Statutes (*part* 1, *chap.* 18, *title* 4, *sec.* 4), in these words : " It shall not be lawful to make any transfer or assignment in contemplation of the insolvency of such company, to any person or persons whatever, and every such transfer and assignment to such officer, stockholder, or other person or in trust for them or their benefit shall be utterly void"

It is quite evident, from a perusal of the whole section, from which the above is extracted, that it was designed to interdict transfers of property, by a corporation, which had committed, in effect, some act of bankruptcy, in a refusal or omission to pay its notes, or other evidences of debt, and which was in fact insolvent. ·

It may be well questioned, whether the corporation could invoke the aid of this statute to avoid its own act ; what complaining stockholders might do in its name, is another question.

· But waiving that, there is no evidence which brings the plaintiff within the terms of the act in question.

It had not refused the payment of its debts. There is no evidence that it owed any thing, except the damages in question to the defendant corporation. No creditor has appeared to object to this transaction. •

After transferring the patents to the defendant corporation, it still had the control of funds, a few thousand dollars, which was turned over to Sheldon.

What the condition of the plaintiff would have been, had no arrangement or settlement been effected, and the defendant corporation had been compelled to sell under process, the plaintiff's property to pay a judgment for damages, it would be useless to speculate. There is no reason, however, to believe that the fruits of such sale would have paid the damages. The learned counsel for the plaintiff further contends that in no event did the transfers secure the assent of a majority of the trustees of the plaintiff.

By the original articles of association of September, 1867, it was provided that the number of trustees of the corporation

should be three, who were named therein, as follows: Julius Sheldon, Archibald T. Finn and Charles Atwood, Jr., who were to manage the affairs for the first year.

The by-laws also provided that the board of directors should consist of three persons, to be elected by ballot at each annual meeting of the stockholders, or in default thereof, at a special meeting to be called for the purpose, and in case of no election the old board should hold over until the next general election, and their successors are appointed.

At a meeting of the directors held on the 5th day of December, 1870, at which were present A. T. Finn and Charles Atwood, Jr., it was resolved, that four more directors be added to the direction. And the record of the annual meeting, held at the office of the company, on the 6th of October, 1870, shows that an election was held and A. T. Finn, George Dickerson, Edmund Tweedy, H. O. Pearce, Julius Sheldon, Charles Atwood, Jr., and Joseph Plume, in all seven persons, were declared chosen directors for the ensuing year.

At a subsequent meeting of the directors it was declared that their number should be six.

Of the persons chosen on the 6th December, 1870, as trustees, two, Dickerson and Pearce, declined to serve and resigned at a meeting of the directors held on the ninth and John J. Silcock and Jacob Surrenus were chosen as trustees in the place of Dickerson and Pearce.

The records do not show whether Silcock or Surrenus accepted the places, but they have attended no meeting of the trustees.

Plume was secretary of the board, and although present at the meetings he never records himself among the list of directors present, except in one instance and that was at the meeting on the 9th December, 1860.

As far as H. O. Pearce is concerned, while it does not appear that he ever acted as a trustee, it is shown that he advised the settlement, and Plume was present at, and

recorded the proceedings of, the meeting of the 10th April, 1873.

As no certificate was filed as required by section 2 of the act of April 11, 1860, it is quite clear that the number of trustees was never increased, and that the proceedings, in that direction, above referred to, were, in law, as they appear to have been regarded by the parties in fact, a nullity, and that the only persons qualified to act as such were the three persons named in the original certificate who appear only to have actually taken part in the management of the affairs of the corporation and who are found to have authorized the transfers.

This action is brought in the name of the corporation. It is in evidence that from and after the transfers of its patents to the defendant corporation it never prosecuted any business, and that it had in fact ceased to use its franchises.

The stockholders, with knowledge of the settlement with the defendant corporation, and the terms of which some actually approved and advised, have taken no steps to disturb the same.

There has been an acquiescence through silence for many years. The defendant corporation, in the meantime, having effected improvements on the blocking patents has used them in its business in connection with its stretching processes.

No meeting of plaintiff's trustees or stockholders has been held since April, 1873, until just before the commencement of this suit.

On the 27th day of January, 1877, according to a minute thereof produced, stockholders representing 1,724 shares of stock met and proceeded to the election of directors and the result reached was that *five* persons, Julius Sheldon, James L. Todd, John Silcock, Jacob Surrenus and L. Buckman each received 1,724 votes. As each of the five persons received the same number of votes it is impossible to state what persons were elected if the election were otherwise regular. The record, however, says that the *five* persons were chosen.

On the 12th of February, 1877, a meeting of these five persons, or some of them, was held, and Julius Sheldon was named as president.

The by-laws of the corporation provide, that an election of trustees, shall be held on the first Monday of October of each year, and further, that if the election shall not be held on that day, a special meeting of the stockholders shall be called for that purpose, and that the old board should hold over until the new one should be elected.

Such meeting of stockholders could only be called by the old board of trustees; how it was summoned does not appear, nor does the records show that notice was given to all the stockholders, of the proposed meeting. But I do not consider it important to determine whether or not, the old directors were displaced by the meeting of the 27th of January 1877.

It does not appear that any authority was given at this meeting of stockholders, nor at any other meeting of them, or of the newly chosen trustees, for the commencement of this action, nor that any inquiry has been directed to be made in respect to the transfers of the patents and licenses, to the defendant corporation.

For all that appears, the commencement of this action is the individual act of Sheldon, who verified the complaint. Considering the circumstances of this case, the time which has elapsed since the transfers were made, the fact that the corporation has not transacted business for many years, the relation which Sheldon bore to the transfers, and the part he took in the negotiations which led to them, his receipt of $8,000 of the funds of the corporation, contemporaneous therewith, and his desertion of his duties for so long a time, would seem to demand that there should have been some distinct, affirmative direction, proceeding from those interested, authorizing the commencement of this action in the corporate name.

There are some considerations, which bear upon the equities of the case, and which go far to support the conclusion, to which the facts above stated lead, that this action cannot be

Sheldon Hat Blocking Co. agt. Eickmeyer Hat Blocking Co.

sustained. The complaint demands that the transfers be set aside, and the property restored to the plaintiff; yet no offer is made with respect to the payment of the defendants' damages reported by the master. No exceptions have ever been filed to the master's report.

No relief could, under the circumstances, be granted except on the condition of payment of these damages, which would amount, principal and interest, at the present time, to $135,000. It is not averred that the plaintiff is either able or willing to pay the damages; its present ability is not as great as when the transfers were made. One who asks equity must do equity. Plaintiff should at least have tendered payment, before suit brought, or the complaint should have offered it. It is silent on this subject.

The licenses transferred cannot be restored for the reason that under them the licensees were allowed to use the stretching machines, and, besides, new licenses have been issued by the defendant corporation, in their place, and the blocking machines have been, in the meantime, added to and improved by the defendant corporation. The "*status quo*" cannot be restored. After a full examination I find nothing in the case to impeach the honesty and good faith of the defendant corporation. That corporation had the right clearly to demand that the patent for stretching hats should be so placed that it might no longer be used to its injury; and as to the residue of the property assigned I cannot find that it amounted to more than an indemnity for the damages in satisfaction of which it was agreed to be taken.

The defendant corporation has acted upon the basis of the settlement for many years, and has taken no steps to enforce its decree obtained in the federal courts, and which, in reliance upon the settlement, it appears to have wholly abandoned. The silence of the stockholders, of the plaintiff and its officers for five years and upwards was, in itself, sufficient to lead the defendant corporation to believe that the settlement was satisfactory to them.

Parties asking to vacate settlements and transfers of property should move without delay, so soon as they are made known, unless there exists some disability.

No fact appears in the case which was not known to all the persons interested in the plaintiff when the settlement was made and the transfers completed in the year 1873.

A court of equity does not regard, with favor, delays of this character. Such laches is evidence of weakness and not of confidence in the equity and justice of a complainant's case. No excuse for the delay appears.

And while I would be unwilling to abate any thing of the responsibility resting upon trustees of a corporation with regard to the management of the corporate property, and without, in anywise, authorizing any transgression by them of the good rules governing their action in the control and disposition of the corporate property and assets, I am still of opinion that in this case equity is well satisfied by allowing the settlement and transfers made in May, 1873, to stand undisturbed.

Under this conclusion the complaint must be dismissed, with costs.